IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

LAURA ADAMS,

    Defendant.

CRIMINAL ACTION FILE NO.

1:18-cr-507-LMM-AJB

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court are the following motions filed by Defendant Laura Adams: motion to suppress statements, [Doc. 105]; motion to suppress evidence from 220 Oakwood Circle, Stockbridge, Ga., [Doc. 106]; motion to bifurcate Count Twelve and the 21 U.S.C. § 841 enhancement, [Doc. 107]; motion to suppress evidence from cell phone, [Doc. 108]; motion for return of property (cell phone), [Doc. 109]; and amended motion to suppress evidence from cell phone, [Doc. 115]. The Court conducted an evidentiary hearing on the suppression and return-of-property motions, [Doc. 132 (hereinafter "T__")], after which the parties filed briefs, [Docs. 140 (Gov't), 142 (Adams)]. For the reasons that follow, the undersigned **RECOMMENDS** that (1) the suppression motions be **GRANTED IN PART and DENIED IN PART**, (2) the motion for return of property be

**DENIED**, and (3) the bifurcation motion be **GRANTED IN PART and DENIED IN PART**.

### I.     *FACTS*

From the evidentiary hearing, the Court finds the following facts. On January 10, 2019, Carrollton, Georgia, Police Department Investigator Kelly Bennett was a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA).  He and other law enforcement officers had a federal arrest warrant for Adams issued upon the return of the initial indictment in this case. Bennett, DEA Special Agent Linh Voung, and DEA TFO Howard Spitzer[1] were in the vicinity of Adams's residence, 220 Oakwood Circle, in Stockbridge, Georgia. T4-5; *see also* T47.  The officers were in separate unmarked vehicles.  T5-6.  At about 4:00 PM, Bennett saw Adams arrive at the location as a passenger in a vehicle and then exit the vehicle.  T6.  Bennett was familiar with Adams's appearance from surveilling her earlier in the investigation.  T28-29.  He knew that Adams had a criminal history for drug trafficking but did not know whether she was a drug addict. T42.  Bennett was on plainclothes but was wearing a bullet-proof vest with police markings, and his firearm was holstered.  T7.

---

[1]     Spitzer was a sergeant with the Spalding County Sheriff's Office Special Operations Narcotics Division and a DEA TFO.  T46.

From the distance of 20 to 25 feet, in a loud and stern voice Bennett directed Adams to come towards him.  Adams momentarily walked increasingly quickly towards her house (which was adjacent to the driveway), but then she complied with Bennett's directive.  T7-8, 32, 33.  Bennett approached Adams and grabbed her by the wrist.  T8.  The bag of food Adams was carrying was placed on the vehicle.  T8, 45.  Bennett handcuffed Adams's hands in the back.  T9.  Within 20 seconds of this encounter, SA Voung arrived and interacted with the male and female in the vehicle that Adams had just exited.  T8, 45.

Bennett described the initial "contact phase" as "amped up a little bit."  T9.  He explained to Adams that there was a warrant for her arrest and when Adams asked what for, Bennett stated that someone would be present shortly to explain it to her.  T10.  Adams appeared nervous, was speaking rapidly, and was visibly shaking.  Bennett described Adams as "hysterical."  T10.

Within several minutes Spitzer arrived, accompanied by six plainclothes detectives from the Henry County Sheriff's Office.  T11, 41, 50, 76.  None of them was running or yelling, nor was a weapon drawn.  T11.  Spitzer, Bennett, and Voung remained with Adams while the detectives spoke to the vehicle occupants.  T11-12, 52.  Bennett observed that Adams had begun to calm down.  T12; *but see* T51 (Spitzer describing Adams as "kind of borderline sobbing, obviously a little

bit upset."), 82 (Spitzer describing Adams as nervous and upset).  Spitzer was dressed in plainclothes but displayed his badge and was wearing a throw-over vest identifying him as law enforcement.  His weapon was hidden.  T51, 88.[2]  Spitzer was aware of Adams's criminal history and assumed that she was addicted to drugs, but he did not think that she was "high" that day.  T92-93.  Although Spitzer could not say that Adams was "clean," during the course of his interaction with her that day she appeared lucid, not under the influence, and appeared to understand everything going on and what he was saying to her.  T93.

Spitzer identified himself to Adams as being with the DEA.  T51-52.  Adams, while sobbing a little bit, stated that she did not know what this was about but she had done federal time before and wanted to talk with the officers.  T52.  Spitzer showed her the arrest warrant and Adams stated that she wanted to cooperate.  T53.  Spitzer advised Adams of her *Miranda* rights by reading them from a preprinted DEA Form 13 card.  T12-13, 53; Govt. Ex. 1.[3]  Adams stated that she understood

---

[2]     Spitzer was 6' 1" tall and weighed 240 pounds.  Adams was 5' 2" tall. T81.

[3]     Govt. Ex. 1 provides, in relevant part, as follows:
 Before we ask you any questions, you must understand:
 -You have the right to remain silent.
 -Anything you say can be used against you in court.

her rights and wanted to fully cooperate, but that she wanted to speak with the agents in private and not in public.  T14-15, 34, 53-54, 55, 78.  Spitzer suggested that they go inside Adams's residence, and Adams agreed.  T15, 55, 78.  Adams did not appear confused in any way and was lucid, although she was still sobbing a little bit.  T15, 54.  Spitzer's demeanor was casual and "borderline friendly."  T15, 55-56.

Before Adams, Spitzer, and Bennett entered the residence, Adams's handcuffs were moved from the rear to her front.  T15, 56.  Adams was asked if anyone was inside the residence and she responded that she was not sure, since her boyfriend or "Jennifer" could have been inside,  She also reported that she had dogs.  T16, 35, 56.  She unlocked the door with her key that she was allowed to retrieve from her purse.  T16, 56.  Adams was asked if she would permit a protective sweep of the house to make sure that no one else was inside, and she agreed.  T16, 35, 58.  Bennett, Voung, and the Henry County detectives performed the security sweep.

---

-You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

-If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand?

Are you willing to answer some questions?

They yelled "police" as they went through the residence. Although the officers were yelling to make themselves known, they did not unholster their weapons. The sweep took about two minutes. T18-19, 37. During the sweep, Bennett located a female named Jennifer Marchant Betsill in the basement. A quantity of a crystalline substance that appeared to be methamphetamine was located on top of her purse in the room where she was located. T18-19, 38, 58. Bennett told Spitzer what he found. T19, 58-59. Spitzer was familiar with Betsill as a known methamphetamine user residing on the southside of Atlanta. T58.[4]

Spitzer and Adams sat at a table in the dining room. While the protective sweep still was ongoing, Spitzer spoke with Adams about her delivering a pound of methamphetamine and an ounce of heroin to Spitzer during an earlier undercover investigation, as well as her involvement in the case in general. T88-89. Spitzer did not believe Adams's statements as to a portion of one undercover deal. He told her that he would tell the Assistant U.S. Attorney that she was not telling the complete truth, and advised her that she needed to be completely truthful. T90-91.

Spitzer also noticed in plain view in the dining room area a digital scale and

---

[4] Betsill ultimately was arrested on state drug charges. One or both of the persons who had arrived at the house with Adams were charged with marijuana possession. T68.

6

a measuring cup with apparent methamphetamine residue, as well as a TV monitor displaying four outside security cameras  To Spitzer, these items were indicative of a methamphetamine distribution operation.  T59.[5]  Spitzer brought those items to Adams's attention and asked her if there was any methamphetamine in the house. Adams stated that there should not be any, but there were a number of people coming in and out of the house.  T59-60.  Spitzer asked her if they could search the house to make sure that there was no methamphetamine or anything else illegal in the house, and Adams responded that they could.  T60.

Spitzer then presented Adams with a consent-to-search form.  T19.  Adams was seated at the dining room table and was still handcuffed with her hands in front. T21.  When asked to give consent, Adams initially was hesitant and stated that she was not sure or asked whether she had to consent.  T22, 23, 40, 60, 89, 91-92. Spitzer advised that she did not have to sign the form or consent to a search at all, and that she could refuse to consent to the search.  T60.  At this time, Adams was still sobbing a bit but continued to state that she wanted to cooperate.  T61.

Spitzer advised her that she had the right to refuse to consent, but that since he already was aware of the methamphetamine found downstairs with Betsill, the

---

[5]      Another monitor for the security system was found in the bedroom. T82.

digital scale, and the apparent methamphetamine residue, he would contact the U.S. Attorney's Office to apply for a search warrant.  T22, 23, 40, 61, 90.  Adams responded that that would not be necessary.  T25, 61. Spitzer repeated that she had an absolute right to refuse to consent to the search and she did not have to sign the form, but she stated that she was willing to consent.  T61.  In presenting her the form, he told her to make sure that she read it, which she appeared to do, and asked her if she had any questions about it.  T61-62.  She stated that she did not.  T61. She also stated that she understood the form.  T62.  Adams signed the consent-to-search form, Govt. Ex. 3, which provided in material part:

1.  I have been asked to permit Special Agents of the Drug Enforcement Administration to search: (Describe the person, places or things to be searched.)
*220 Oakwood Cir. Stockbridge, GA*

2.  I have not been threatened or forced in any way.

3.  I freely consent to this search.

|  |  |
| --- | --- |
| *01/10/19  4:40 pm* | *s/ Laura R. Adams* |
| Date | Signature |
|  |  |
| Witnesses: | *s/ Howard Spitzer* |
|  | *s/ Kelly Bennett* |

T25.  Spitzer did not threaten Adams to sign the form, nor use any deception.  T23. Spitzer told her again that she could refuse to consent, and she could withdraw her

consent at any time during the search.  T62.  Spitzer told Voung and the Henry County detectives that Adams consented to a search.  T63.

While the search was occurring, Spitzer remained at the dining room table with Adams and questioned her.  T26, 63.  She was cooperating, although there were times when Spitzer did not believe that she was being truthful.  T63.  She did not invoke her right to remain silent or request a lawyer during the questioning. T63-64.  On occasion, she stated that she wanted to cooperate and a few times stated that "I'll do anything."  T64.[6]

While searching the residence, the Henry County detectives located a safe on Adams's bed, brought it to the dining room, and placed it on the table.  T64, 94. Spitzer described Adams's demeanor as immediately changing and she became nervous.  T64-65.  She admitted it was her safe but that she didn't know where the keys were.  Spitzer asked her if it was possible that the keys were on her key ring, and although she responded that she did not know, she gave the key ring to Spitzer. The safe was opened with one of the keys, and located inside were three pistols,

_____

[6]     Spitzer testified that Adams's statements that she would "do anything" placed him on guard because, while it may have been Adams's way of stating that she would cooperate including furthering other investigations and testifying against codefendants, it also may have been an effort to engage in inappropriate conduct to jeopardize the case.  T64.

new and unused hypodermic needles, drug-packaging materials, a scale, and a quantity of methamphetamine. Adams stated that she did not know much about the things in the safe but she did not revoke her consent. T65-66. The safe also contained an automobile insurance card in Betsill's name. Def. Ex. 2; T86. Adams began sobbing more and denying knowledge about the safe's contents. When Spitzer stated that she possessed the keys to it, Adams responded that there must be other keys out there. T67.

As the questioning continued, Spitzer asked Adams about her cell phone, which was attached to her purse. Although Adams was being generally cooperative, there were areas about which Spitzer concluded that she was being less than completely candid, and the contents of her cell phone were relevant to those events. T68. After obtaining the phone, Spitzer asked Adams if there were "any dope deals on this phone" and Adams responded "probably." T69, 96. Spitzer then asked her if he could search the phone, and Adams asked if he needed a search warrant. Spitzer responded, "not necessarily," and stated that she could consent or he could apply for a search warrant. Adams then gave him permission to search the cell phone, provided him with the passcode, and directed him to the correct power cord to use to charge the phone. T69, 95-96. In reviewing the phone's contents, Spitzer came across a text-message stream in which someone was seeking to buy seven

grams of methamphetamine from Adams, and Adams cooperatively discussed that transaction with Spitzer.  T70, 96.  Spitzer also verified that communications about another transaction about which he was interested were not on that cell phone because Adams had used a different phone during that transaction.  T71, 97.

Spitzer described the atmosphere of the questioning as casual and low energy, although he acknowledged that, except for a few occasions when she stopped, Adams was sobbing throughout the questioning.  T70-71.  This description of the atmosphere was generally corroborated by Bennett's observations.  Bennett and Betsill spent 15 to 20 minutes outside of Adams's residence trying to retrieve the dogs that had escaped.  T25.  On Bennett's return to the residence, he observed Adams and Spitzer sitting at the dining room table going through Adams's cell phone.  T26.  Adams had calmed down a little bit more by this time.  T26.

After about three hours, Adams was transported to the detention center by Spitzer and other agents.  T27, 72.  During the trip, she made both solicited and unprompted statements about wanting to cooperate.  T72.

Spitzer concluded that the cell phone did not contain evidence that he was interested in concerning the charged conspiracy, and so he just logged it into evidence without applying for a search warrant to search it.  T74, 97-98.  He did not advise the AUSA about the cell phone until about the time of the superseding

11

indictment in September 2019, when he recognized that there was evidence of drug dealing on the phone that was relevant to the gun charges.  T75, 99, 100.  Then, the cell phone was searched pursuant to a warrant issued on October 29, 2019.  [Doc. 115-1 at 1].  Adams did not request the return of her cell phone prior to filing the pending motion for its return.  [T100].

Adams is charged by way of a superseding indictment with conspiracy to possess with intent to distribute at least 50 grams of methamphetamine (Count One), possession with intent to distribute at least 50 grams of methamphetamine (Count Eleven), and possession of a firearm after being a convicted felon (Count Twelve).  [Doc. 93].  The conspiracy alleged in Count One is alleged to have occurred between October 12, 2017 and March 14, 2018, and the substantive drug-trafficking crime in Count Eleven is alleged to have occurred on March 18, 2018.  [*Id.* at 1, 9].  In each of the drug counts naming Adams, the indictment contains a prior conviction notice.  [*Id.* at 2, 9].  The felon-in-possession count alleges possession of firearms on January 10, 2019.  [*Id.* at 9-10].  The government has filed an amended sentencing information establishing a prior conviction of the purposes of increased punishment pursuant to 21 U.S.C. § 851.  [Doc. 118].

## II.   _PENDING MOTIONS_

### A.   _Motion to Suppress Evidence from 220 Oakwood Circle, Stockbridge, Ga._, [Doc. 106]

#### 1.   **Arguments**

The government contends that Adams's residence was lawfully searched pursuant to her voluntary consent, and that it has satisfied all of the prerequisites for demonstrating that Adams voluntarily consented to the search. [Doc. 140 at 10]. In support, it points out that she was advised of, and waived, her _Miranda_ rights, read and signed the consent-to-search form, and was informed of her right to refuse and withdraw her consent. [_Id._]. It also contends that the record contains no evidence that the officers employed any coercive or deceptive conduct towards her, or even raised their voices, and instead shows that they dealt with Adams in a friendly and calm manner. [_Id._].[7]

---

[7]   The Court rejects out of hand the government's argument that "because Adams is a convicted felon, she should also know her constitutional rights." [Doc. 140 at 10]. A person's criminal history, without more, is no proof that the person is aware of her constitutional rights. The record is devoid as to what Adams's prior experiences in the criminal justice system involved (other than that she had a prior conviction for drug trafficking) and whether those experiences involved a waiver of constitutional rights, much less a waiver of the rights involved in this case under the Fourth, Fifth, and Sixth Amendments, or whether any such waiver was prompted by constitutionally-effective advice or was otherwise lawful.

13

The government next argues that Adams's age (nearly 40), education level, and being a life-long Georgia resident and English speaker, as well as her criminal history, points to voluntary consent.  [*Id.* at 10-11].[8]  It also contends that while Adams was upset, there is nothing to demonstrate that she did not understand what was being requested of her.  [*Id.* at 11]. Next, the government argues that Adams repeatedly told the officers that she wanted to cooperate, even stating several times that she was willing to do anything, and did not revoke her consent at any time. [*Id.*].  It argues that her cooperation is evidenced by her willingness to speak with the officers, her opening the house with her keys, her agreeing to a protective sweep, and her consent to search her cell phone, including sharing the passcode and arranging for it to be re-charged.  [*Id.*].  The government also submits that she gave the officers the keys to the safe even though she had to know that narcotics and firearms were inside.  [*Id.*].   Finally, the government argues that Adams's interaction with police was not lengthy (no more than three hours), Spitzer was the

_____

[8]     In addition to rejecting the criminal-history justification, *see supra* n.7, the Court notes that the record on the motion to suppress contains absolutely no evidence of Adams's age, educational achievement, or how long she resided in Georgia, although the last asserted fact has little relevance to the issues before the Court.  Even though the undersigned presided at Adams's detention hearing and therefore has reviewed the Pretrial Services Report prepared for that proceeding, such document is not part of the formal record and thus the Court does not consider any facts therein in recommending a resolution to the pending suppression motions.

only law enforcement officer to interview her, and he did so in a friendly, calm, and non-coercive way.  [*Id.*].

Adams responds that her consent was not voluntary.  She argues that at the time of her arrest she was in her thirties, had limited education,[9] and her criminal history "might make her justifiably afraid of law enforcement officers and potential prosecution." [Doc. 142 at 6].  She was under duress and sobbed continuously, and when Spitzer believed she was not fully cooperating, he stated that he would call the AUSA and so advise her.  [*Id.* (citing T91)].  Spitzer and Adams spoke about the case for approximately 20 minutes before she signed the consent form, all while up to eight armed police officers were in the residence.  [*Id.*].

Adams also contends that when she was asked to consent to the search, she also asked whether she had to, and Spitzer stated that based on what he knew, he would call the AUSA and ask about applying for a search warrant.  [*Id.* at 7 (quoting T90, 92)].  It was then that she signed the consent-to-search form, while she was still handcuffed and sobbing.  [*Id.*].  She argues that she did not freely and voluntarily provide consent to search while handcuffed, crying and "being threatened by the officers."  [*Id.*].  She argues that she could not be found to have

---

[9]    The Court does not consider these factual assertions for the same reasons stated in nn. 7 & 8 *supra*.

voluntarily consented because she is a drug addict[10] with a prior criminal history who was confronted with nine police officers in her front yard; she was grabbed and handcuffed; although she repeatedly stated that she wanted to cooperate, when the officers determined that they did not believe her, she was threatened with a call to the prosecutor; and the officers already had found drugs in the house.  [*Id.* at 7-8].

## 2.    Discussion

The Court concludes that Adams freely and voluntarily consented to the search of her residence.  The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. CONST. AMEND. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000); *see also United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005) ("In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause.").  Evidence obtained in violation of

---

[10]    *But see* nn. 7 & 8 *supra*.

the Fourth Amendment must be suppressed. *United States v. Gilbert*, 942 F.2d 1537, 1541 (11ᵗʰ Cir. 1991).

Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11ᵗʰ Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5ᵗʰ Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11ᵗʰ Cir. July 8, 2009). Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

A search conducted pursuant to voluntary consent is a recognized exception to the requirements of probable cause and a search warrant. *United States v. Harris*, 928 F.2d 1113, 1117 (11ᵗʰ Cir. 1991) (citing *United States v. Baldwin*, 644 F.2d 381, 383 (5ᵗʰ Cir. 1981)). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11ᵗʰ Cir. 1989). In considering whether a consent to search was voluntary, the Court examines the totality of the circumstances. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11ᵗʰ Cir. 1995); *see also United States v.*

17

*Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in a totality-of-the-circumstances inquiry). " 'The government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)); *see also Florida v. Bostick*, 501 U.S. 429, 438 (1991) (" 'Consent' that is the product of official intimidation . . . is not consent at all."). The decision to consent is voluntary when an officer does not use imperatives and instead makes requests that the defendant is free to deny. *United States v. Batson*, 749 Fed. Appx. 804, 806 (11th Cir. Sept. 11, 2018) (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc)).

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent

18

to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.[11]   *Blake*, 888 F.2d at 798-99.   None of these factors is controlling.   *United States v. Phillips*, 664 F.2d 971, 1023-24  (5th Cir. 1981)[12] ;  *accord United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984); *see also Blake*, 888 F.3d at 798 ("The determination as to whether a suspect's consent is voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.")

The government has the burden of showing, by a preponderance of the evidence, both that there was consent to search and that the consent was voluntary. *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004) (citing *Blake*, 888 F.3d at 798).  Although the preponderance standard is not as difficult to meet as the reasonable-doubt or clear-and-convincing standards, it "is not toothless," and the government must meet its burden with "reliable and specific evidence." *United*

---

[11]      *See United States v. Hall*, 565 F.2d 917, 921 (5th Cir. 1978) ("Hall's stated belief that no incriminating evidence would be found is a factor pointing to the validity of his consent.  Believing he had nothing to hide, he had nothing to gain by refusing to consent to the search.").

[12]      In *Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*States v. Cusick*, 559 Fed. Appx. 790, 792 (11th Cir. Feb. 24, 2014) (quoting *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995)).

Application of these factors predominates in a finding that Adams freely and voluntarily consented to the search of her residence. First, she was in lawful custody, having been arrested on a valid warrant issued as a result of the current charges. While being in custody is a factor that militates against finding voluntary consent, "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976); *United States v. Smith*, 199 Fed. Appx. 759, 763 (11th Cir. Sept. 15, 2006) ("The fact of custody does not necessarily vitiate the defendant's valid consent to a search.") (citing *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973)) *see also United States v. Witten*, 649 Fed. Appx. 880, 887 (11th Cir. May 13, 2016) ("That Witten was in police custody at the time he consented to the search does not render the consent involuntary.").

Next, the government has proven the lack of coercive police procedures in obtaining Adams's consent. "[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent." *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (quoting *Jones*, 475 F.2d at 730). She was

20

arrested lawfully upon process issued by the court, outside her home in the afternoon hours.  Adams was advised on several occasions that she did not have to consent.  T60, 62.  She read and signed the consent-to-search form.  T61, 62.

Further, although she was briefly grabbed by Bennett, there is no evidence that the force he used was unreasonable given Adams's initial feint away from him following his order for her to walk towards him, nor was the force Bennett applied excessive or prolonged.  Also, it is true that she was handcuffed when she was asked to consent, but the Eleventh Circuit has not found the mere fact that a defendant is handcuffed sufficient to vitiate an otherwise voluntary consent to search.  *See United States v. Telly*, 362 Fed. Appx. 83, 86-87 (11th Cir. Jan. 21, 2010) (finding voluntary consent where defendant was in handcuffs and in custody because officers did not employ any coercive tactics, brandish their weapons, or threaten, lie, or otherwise pressure defendant into acceding to their request for consent to search); *United States v. Brown*, 223 Fed. Appx. 875, 880 (11th Cir. Mar. 29, 2007) (per curiam) (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs), *United States v. Villanueva-Fabela,* 202 Fed. Appx. 421, 427(11th Cir. Oct. 27, 2006) (holding that fact that defendant was in handcuffs does not, by itself, make consent involuntary) (citations omitted); *United States v. Williams*,

21

199 Fed. Appx. 828, 832 (11th Cir. Oct. 3, 2006) (consent voluntary where defendant, who was handcuffed in back of police car, was told he was not under arrest and allowed to speak with wife). In fact, the Eleventh Circuit has found a consent to search voluntary in circumstances with far greater levels of force/duress than present in this case. *See Hidalgo*, 7 F.3d at 1567, 1571 (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gun point); *Garcia,* 890 F.2d at 362 (finding voluntary consent to search where 14 agents surrounded the home, defendant was in handcuffs, and defendant initially consented to a limited search but then was told by officers that unless he gave full consent they would get a warrant and return); *United States v. Long,* 866 F.2d 402, 404-05 (11th Cir. 1989) (finding voluntariness where officers threatened to return with a warrant and "dig the place up" unless defendant consented to a search); *United States v. Espinosa-Orlando,* 704 F.2d 507, 510, 513 (11th Cir. 1983) (concluding consent voluntarily given after four officers had drawn their weapons, asked the defendant to step away from his car, told him to lie on the grass, and asked for consent while he was on the ground and one officer still had his weapon drawn). For the same reason, the number of officers on the scene does not point towards involuntariness of Adams's consent, particularly where only two law

enforcement officers—Bennett and Spitzer—actually had any interaction with Adams. *But see United States v. Edmondson*, 791 F.2d 1512, 1515 (11ᵗʰ Cir. 1986) (stating that where the presence of a number of officers "tends to suggest an undertaking which is not entirely dependent on the consent and cooperation of the suspect," the suspect's consent is prompted "by a show of official authority" and is not given voluntarily).  No firearms were brandished either at the time of Adams's arrest, during the protective sweep, or, most importantly, during the period of time that Spitzer asked Adams for consent to search.  Differentiating this case from *Edmondson*, the record is clear that Adams wanted to cooperate and consented to allowing law enforcement to question her inside the residence and to perform a protective sweep.

It is true that when asked to give consent, Adams initially was hesitant and stated that she was not sure or asked whether she had to consent, but Spitzer advised her that she did not have to sign the form or consent to search at all, and that she could refuse the consent to search.  T60.  He then told her again that she had the right to refuse to consent, and that since he already was aware of the methamphetamine found downstairs, the digital scale, and the residue, he would contact the U.S. Attorney's Office to apply for a search warrant.  T22, 23, 40, 61, 90.  Adams responded that that would not be necessary.  T25, 61. Spitzer repeated

23

that she had an absolute right to refuse to consent to the search and did not have to sign the form, but she stated that she was willing.  T61.  Contrary to Adams's argument, she was not coerced into giving consent due to Spitzer's threat to obtain a warrant; that is, she did not merely "acquiesce to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49.

The Eleventh Circuit has summarily expressed that an officer's statement that he will obtain a search warrant does not establish coercion, but, in those cases, the Eleventh Circuit did not analyze whether the same holds true if the officer had no basis for obtaining a warrant or made the statement as a pretext for coercion. *See United States v. Aguilar*, 519 Fed. Appx. 541, 545-46 (11th Cir. May 22, 2013) ("Although Aguilar testified that an officer told him that, if he did not consent, officers would seek a search warrant and that officers had their hands on their weapons, there is no evidence that this statement and those actions rose to the level of coercion."); *United States v. Racca*, 255 Fed. Appx. 367, 369 (11th Cir. Oct. 18, 2007) ("Even if the officers had stated that they would get a warrant if he did not consent, this would not render his consent involuntary; that the police inform a party that they will obtain a warrant if the party does not consent to a search does not amount to coercion.") (citing *Garcia*, 890 F.2d at 361); *United States v. Baker*, 206 Fed. Appx. 928, 930 (11th Cir. Nov. 17, 2006) (". . . Baker's consent to search

24

was not vitiated because officers told him that they could attempt to obtain a search warrant if he did not consent to the search.") (footnote omitted) (citing *Garcia*, *id.*).

In *Tovar-Rico*, 61 F.3d at 1535-36, the court affirmed a finding that the consent was involuntary where during a protective sweep, officers explored every room of the residence and then, when asked to consent, the defendant was told that she did not have to permit the further search, but if she did not, the agents would come back with a search warrant. The district court found that she "could not reasonably have known that she could still refuse a search," *id.* at 1536, a finding affirmed by the Eleventh Circuit.

At the same time, the Eleventh Circuit and former Fifth Circuit have suggested that a statement concerning a search warrant that is baseless or based on a misrepresentation, or a threat to summon a K-9 unit, could render consent involuntary. *See United States v. Savage*, 459 F.2d 60, 61 (5th Cir. 1972) (consent was not rendered involuntary by an officer's " 'Yes, we probably can' " response to whether the officer could get warrant because it had not been a factual misrepresentation and it had been made in response to an inquiry); *United States v. Boukater*, 409 F.2d 537, 538 (5th Cir. 1969) (observing the court might find consent involuntary if the defendant had not been free to leave and the officer had either said or implied the defendant might as well consent because a warrant could be

25

quickly obtained if he did not); *United States v. Rendon*, 462 Fed. Appx. 923, 924-26 (11th Cir. Mar. 12, 2012) (accepting a magistrate judge's determination and the government's concession that a driver's consent was involuntary where the driver initially refused to give consent, an officer responded he had a right to refuse but the officer would just call for a drug dog, and the driver thereupon consented; but independent, untainted probable cause existed due to positive alert by drug dog).

The Court concludes that Spitzer's statements about applying for a warrant did not coerce Adams into consenting.  First, Spitzer's statement to Adams was an accurate statement of his authority.  He stated that he would call the U.S. Attorney's Office to seek that office's application for a search warrant.  He did not overstate his authority by claiming either that he would get a warrant without the intervention of the prosecuting attorney applying for a warrant or represent that he would in fact get a warrant, but only that one would be sought.

Second, the facts demonstrate that Spitzer indeed had probable cause to apply for the search warrant given the discovery of suspected methamphetamine in the basement where Jennifer Betsill was located, the in-plain-view discovery of a digital scale and measuring cup with apparent methamphetamine residue, and the TV monitor displaying four outside security cameras, all of which was indicative of methamphetamine distribution.  The officers' sighting of the drugs and drug

26

paraphernalia constituted sufficient probable cause to apply for and obtain a search warrant. *United States v. Hood*, No. 2:14-CR-20-FTM-29CM, 2014 WL 7005014, at *10 (M.D. Fla. Dec. 10, 2014) (citing *United States v. Hromada*, 49 F.3d 685, 690 (11th Cir. 1995)), *aff'd sub nom. United States v. Lesane*, 685 Fed. Appx. 705 (11th Cir. Apr. 12, 2017). As a result, the Court concludes that Adams was not coerced to consent by Spitzer's statements about calling the U.S. Attorney's Office to apply for a warrant. *Cf. United States v. Vasquez*, 724 F.3d 15, 20 (1st Cir. 2013) (finding consent involuntary when the agents misrepresented that a search would ensue even without a warrant); *United States v. Hicks*, 539 F.3d 566, 571-72 (7th Cir. 2008) (finding consent involuntary when officer made a "baseless threat[ ]" that he could get a search warrant, even though he did not personally know if there was probable cause).

Next, the evidence demonstrates that Adams expressly and actively cooperated with law enforcement, a fact that points to finding her consent-to-search voluntary. *United States v. Cota-Lopez*, 358 F. Supp. 2d 579, 595 (W.D. Tex. 2002) (recognizing that a person's active assistance of the police and lack of animosity is indicative of voluntary consent). Adams offered to cooperate as long as they could discuss her cooperation in private and not in public. T61. Spitzer suggested and Adams agreed that they could discuss her cooperation inside her

residence.  Prior to the time that he was asked to consent to search, Adams agreed to a protective sweep of her residence.  T15, 35, 38.  Then, when asked to consent to search, she reiterated that she wanted to cooperate.  T61.  Adams stated that she was willing "to do anything," which evidences that she was willing to cooperate with the officers in their investigation although Spitzer was concerned that this comment was indicative of something more nefarious.  T64.  Finally, Adams sat with Spitzer and answered questions.[13]

In addition, although the government did not introduce evidence at the hearing as to Adams's educational level, the record reflects that Adams appeared to read the consent-to-search form and did not voice any complaints as to her understanding of its terms.  Nor did she appear to not understand Spitzer's asking her if she consented, and in fact questioned whether she either had to consent or had to sign the form.  This factor also weighs in favor of a finding of voluntary

---

[13]    Of less probity to Adams's initial consent to search the residence, but certainly not irrelevant, is Adams's assistance in allowing Spitzer to search her phone and giving him the keys to open the safe.  The Court assigns these facts less weight in the analysis of the voluntariness of her consent to search since these events occurred after her initial consent, and because it is not unreasonable for a person in Adams's circumstances to have decided, at that point, that the die had been cast and any objection to search may have been futile.  *See Tovar-Rico*, 61 F.3d at 1536.  Nonetheless, the Court points out that Adams did not withdraw her consent or seek to limit the officers in searching her residence or effects, and actively helped Spitzer gain access to the phone's contents.

consent.

Further, Adams's awareness of her right to refuse consent points to a finding that her consent was voluntary.  She was advised on a number of occasions both before she orally consented and as she was contemplating signing the consent-to-search form that she could refuse to give the officers consent to search. T60, 61.

Finally, the record demonstrates that at the time she consented to the search, Adams believed that no incriminating evidence would be found, thus pointing to a finding of voluntary consent.  The residue located in the dining room as well as the more substantial amount of suspected methamphetamine found in the basement with Betsill already had been located.  When asked whether any other methamphetamine would be located, Adams stated that there should not be any, but added the caveat that there were a number of people coming in and out of the house.  T59-60.  Adams also denied knowledge of the items in the safe.  T65-66, 67.

Accordingly, all of these facts lead the Court to conclude that Adams voluntarily consented to a search of her residence, including her cell phone and the safe.  As a result, the undersigned **RECOMMENDS** that Adams's motion to suppress evidence, [Doc. 106], be **DENIED**.

### B.    *Motion to Suppress Statements*, [Doc. 105]

### 1.    Arguments

The government argues that Adams's post-arrest statements are admissible at trial because she knowingly and voluntarily waived her *Miranda* rights and her statements were otherwise voluntary.  [Doc. 140 at 12].  It contends that, although Bennett grabbed her wrist before arresting her and spoke to her assertively, the initial contact with Adams was relatively casual, since Bennett and Voung walked up to her and did not yell or draw their weapons.  [*Id.* at 13].  It continues that when Spitzer arrived, he *Mirandized* her and although Adams was upset, she indicated a willingness to speak with the officers but that she wanted to do so in private inside her home.  [*Id.*]  The government contends that no threats or promises were made to obtain her cooperation and no firearms were brandished in her presence.  It further points out that although she was hesitant at first to consent to search, she never withdrew her consent or invoked either her right to silence or to a lawyer, and repeatedly stated that she was willing to cooperate.  [*Id.* at 13-14].

Adams responds that upon her arrest, she remained handcuffed, the energy was " 'amped up,' " [Doc. 142 at 2 (quoting T9)], and she was visibly hysterical, shaking, and nervous.  [*Id.*].  When Spitzer approached her shortly thereafter, she was still " 'a little bit upset' " and " 'borderline sobbing,' " [*id.* (quoting T51)].

Thus, she contends, it was apparent that her will was overborne by the officers and their show of force when she was asked to answer their questions in her front yard. [*id.* at 4].  She argues that by then there were nine armed police officers in her presence and claims that the only reason all of those officers were necessary was in order to influence her decision to speak to the police and enter her home. [*Id.* at 5].  She argues that Spitzer's statements about contacting the AUSA "heightened her sense of panic" and thus her statements should be suppressed.  [*Id.*].

### 2.   Discussion

The government bears the burden of showing that a defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary.   *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.

Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of h[er] rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11ᵗʰ Cir. 1983).  The government must prove by a preponderance of the evidence that the defendant waived her rights intelligently, knowingly, and voluntarily.  *United States v. Roper*, No. 20-10159, 2021 WL 236578, *2 (11ᵗʰ Cir. Jan. 25, 2021)

(citing *Parr*, 716 F.2d at 817); *see also United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005).   An accused effectively waives her *Miranda* rights if she: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes her decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.   *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995).   Thus, a waiver is effective where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension.   *United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585).   "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *see also United States v. Johnson*, 379 Fed. Appx. 964, 968 (11th Cir. May 24, 2010).   A defendant need not, however, understand all the consequences of the waiver.   She need only understand her right to remain silent or have her statements used against her.   *Colorado v. Spring*,   479 U.S. 564,   574 (1987);   *see also   United   States   v.   Hernandez*,

913 F.2d 1506, 1510 (10th Cir. 1990) (to determine whether a waiver was intelligent, the court should "inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him . . . A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver.").

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into waiving her rights: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (alteration and internal quotation marks omitted); *see also United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's waiver was the product of "an essentially free and unconstrained choice." *Garcia*, 890 F.2d at 360. Among the factors the Court should consider are the defendant's youth, low intelligence or lack of education, the length of her detention, the nature of the interrogation (was it repetitive or prolonged), the use of any physical punishment such as the deprivation of food or sleep or the use of force against her, or the use of any promises or inducements by police. *See Connelly*, 479 U.S. at 163 n.1; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Gonzalez*, 71 F.3d at

33

828; *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988); *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163  n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). The Court should consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the waiver. *See Miller*, 838 F.2d at 1536.

In addition, in any arrest or custodial situation there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the defendant's waiver or statements. *Cf. Jones*, 475 F.2d at 730 (discussing consent to search following arrest). Moreover, while a defendant's mental condition is a " 'significant factor' " in the " 'voluntariness calculus,' " *Miller*, 853 F.2d at 1536 (quoting *Connelly*, 479 U.S. at 520), even the interrogators' knowledge that a suspect may have mental problems does not make

34

the suspect's statement involuntary unless " '[t]he police exploited this weakness *with coercive tactics.*' "   *Miller*,   853 F.2d at   1357   (quoting   *Connelly*, 479 U.S. at 521 (emphasis in *Miller*)).

Separate and apart from compliance with *Miranda*, the government also must establish that a custodial defendant's statements were voluntary.   *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements.   Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness."); *see also Jarrell v. Balkcom*, 735 F.2d 1242, 1252 & n.11 (11th Cir. 1984) (observing that although *Miranda* and *Jackson v. Denno*, 378 U.S. 368 (1964), protect Fifth Amendment rights, *Jackson* "raises an issue distinct from the *Miranda* question in determining a confession's admissibility and [t]hus, even if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness").

Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver.  The Court evaluates the totality of the circumstances, considering both the characteristics of the accused and the details of the interrogation. *Schneckloth*, 412 U.S. at 226.  The same factors applied for a valid *Miranda* waiver are considered again, plus consideration of whether the defendant was advised of

35

her constitutional rights. *Schneckloth*, *id.*  Again, however, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *Castaneda-Cecelia*, 729 F.2d at 1362-63.  Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

Adams's statements were constitutionally obtained.  First, she validly waived her *Miranda* rights.  Even before the officers asked her to speak with them or she was read her *Miranda* rights, Adams stated that she had done federal time before and wanted to talk with them, T52, and after being shown the arrest warrant by Spitzer, she stated that she wanted to cooperate.  T53.  She had been under arrest for a very short time when Spitzer read to Adams her *Miranda* rights from a pre-

printed card, and Adams stated that she understood her rights and wanted to fully cooperate but wanted to speak with the agents in private and not in public.  T14-15, 34, 53-54, 55, 78.  Spitzer suggested that they go inside Adams's residence, and Adams agreed.  T15, 55, 78.  Adams did not appear confused in any way and was lucid, although she was still sobbing a little bit.  T15, 54.

These facts demonstrate Adams's knowing, intelligent, and voluntary waiver of her *Miranda* rights.  First, she was advised of and stated that she understood her rights.  Second, she understood that giving up her *Miranda* rights meant that she would be questioned and that her statements could be used by authorities, because she expressed a desire to cooperate.  Third, there simply was no unlawful coercion to get her to waive her rights.  As previously noted, although Bennett grabbed her arm and she was handcuffed, the force used was neither unreasonable nor excessive. *Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983) ("The use of handcuffs does not establish coercion. . . ."); *United States v. Ogden*, 572 F.2d 501, 502 (5th Cir. 1978) ("The fact that defendant was wearing handcuffs does not indicate or even suggest that he was coerced."); *see also United States v. Crawford*, No. 118CR318MLBJKL2, 2019 WL 7559737, at *4 (N.D. Ga. Sept. 24, 2019) ("Being handcuffed behind the back and restrained by a seatbelt falls fall short of the type of physical duress that would make the environment so coercive that it

overbore Crawford's free will") (R&R), *adopted,* No. 1:18-CR-00318, 2019 WL 5800271 (N.D. Ga. Nov. 7, 2019); *United States v. Hernandez*, No. 1:13-CR-183-WSD, 2014 WL 869275, at *6-7, 13 (N.D. Ga. Mar. 5, 2014) (finding that suspect was not coerced into waiving his *Miranda* rights and speaking with agents where he was placed in a vehicle for transport to the federal courthouse in Atlanta and restrained with handcuffs, ankle shackles, and a belly band), *report and recommendation adopted*, *id.* at *4.

As for Adams's tearful demeanor, there is no evidence that the officers took advantage of or otherwise exploited her emotional state to get her to waive her *Miranda* rights. While Adams understandably may have been upset about her predicament, there is no evidence that she did not understand the rights as explained to her. In fact, there is evidence to the contrary, including her ability to respond appropriately to Spitzer's questions about her rights, her agreement to cooperate both before and after being advised of her rights, and her express statement that she understood her rights. *See United States v. Thompson*, 422 F.3d 1285, 1296 (11th Cir. 2005) (holding that defendant knowingly, intelligently and voluntarily waived her *Miranda* rights where agent read her rights aloud and where defendant, who was "visibly upset and nervous," then signed a written waiver of such rights); *United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 WL 6529640, at *22

38

(N.D. Ga. Nov. 12, 2010) (holding that despite defendant being upset over his wife, he lawfully waived his *Miranda* rights) (R&R), *adopted,* No. 2:10-CR-00006-RWS, 2011 WL 1497876 (N.D. Ga. Apr. 19, 2011); *see also   United States v. Miller*, 382 F. Supp. 2d 350, 359 (N.D.N.Y. 2005) (noting that although defendant was upset by his arrest, he voluntarily waived his rights because he responded appropriately, appeared to understand his rights, and was not under the influence); *United States v. Santiago*, 174 F. Supp. 2d 16, 27-28 (S.D.N.Y. 2001) (rejecting "shock" theory of suppressing statements because "[i]f astonishment were deemed to convincingly abrogate a defendant's capacity to voluntarily, knowingly and intelligently waive his *Miranda* rights, the number of suspected criminals invoking the doctrine would flourish, effectively nullifying the *Miranda* waiver"). *Cf. Garcia*, 890 F.2d at 362 (finding that nervousness during arrest did not render consent involuntary). Finally, no threats or promises were made to her to get her to waive her *Miranda* rights. The undersigned thus finds that these facts and circumstances show that Adams knowingly, voluntarily, and intelligently waived her *Miranda* rights.

Many of the same considerations demonstrate that Adams's statements were voluntarily obtained. Again, while the record is silent to Adams's educational level, she was not of a young age, there is no evidence that she was of low intelligence,

and she was interrogated in a familiar setting, that is, her home.  The questioning was relatively short (approximately three hours in the late afternoon to early evening, during daylight hours).  *Berghuis v. Thompkins,* 560 U.S. 370, 386 (2010) ("[T]here is no authority for the proposition that an interrogation of [three hours] is inherently coercive") (citing *Connelly,* 479 U.S. at 164, for premise that even where statement is given following an 8-9 hour interrogation, suppression requires some official coercion such as taking advantage of defendant's deficient mental condition); *Arvelo v. Sec'y, Fla. Dep't of Corr.*, 687 Fed. Appx. 901, 904 (11th Cir. May 10, 2017) (holding defendant's confession was voluntary even though he was under arrest and interrogated for three hours, although there was a 40-minute break).  The Court does not find the duration of the questioning rendered the statements involuntary.

Also, other than the initial grabbing of her arm and placing her in handcuffs, the officers used no force against her.  The Eleventh Circuit's precedents require much more force to be employed before finding a confession involuntary.  *United States v. Goodman*, 147 Fed. Appx. 96, 100, 101-02 (11th Cir. Aug. 29, 2005) (statements voluntary despite defendant being handcuffed to a bar); *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (noting that "defendant's confession was voluntary even though it was given after the defendant was placed face-down

on hot parking-lot pavement and handcuffed, an agent put his foot on the defendant's shoulders and pointed a gun at the defendant's head, and the defendant was placed in the back of an unairconditioned police car with the windows rolled up for twenty minutes in July in Miami").

Again, no promises or threats were made to her. The fact that at times Spitzer advised her that her lack of cooperation or truthfulness would be reported to the Assistant U.S. Attorney is not unconstitutional conduct leading to a finding of an involuntary confession. Eleventh Circuit case law is clear: "A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial [or prosecuting] authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary." *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985); *see also United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (finding that a confession is not involuntary merely because of a promise of leniency or because of an agents statements that it would be to a defendant's benefit to cooperate); *Mendoza-Cecelia*, 963 F.2d at 1475 ("Isolated incidents of police deception and discussions of realistic penalties for cooperative and non-cooperative defendants are normally insufficient to preclude free choice.") (citations omitted); *United States v. Nash*, 910 F.2d 749, 752-53 (11th Cir. 1990) (finding that

promising defendant that his cooperation would be made known to prosecutor and that, although not guaranteeing a reduced sentence, advising defendant that "cooperating defendants generally 'fared better time wise,' did not amount to an illegal inducement"); *cf. United States v. Graham,* 323 Fed. Appx.793, 797 (11th Cir. Apr. 20, 2009) (citing with approval *United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir. 1995), which held, "[T]here is no inconsistency between the required warning that a defendant's statement may be used against him and a further statement that cooperation can help him.  Both are true."); *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ("Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him 'holding the bag' does not, as a matter of law, overcome a confessor's will, even though he or she may be sixteen years of age.  Neither is a statement that the accused's cooperation will be made known to the court. . . .").

As for Adams's tearfulness, being distraught, on its own, will not invalidate a statement. *See Corn v. Zant,* 708 F.2d 549, 567 (11th Cir. 1983) (holding that "mere emotionalism and confusion do not necessarily invalidate" statements or confessions), *vacated in part on other grounds*, 772 F.2d 681 (11th Cir. 1985); *see also McMillon v. Culley,* 380 Fed. Appx. 63, 67 n.3 (2d Cir. 2010) (rejecting argument that confession was not voluntary because the defendant was vulnerable

42

18-year old distraught after his mother's death); *United States v. Caldwell,* 954 F.2d 496, 504 (8th Cir. 1992) (finding that even though defendant was upset and nervous when he confessed, there was no evidence that the police engaged in conduct rising to the level of coercion); *United States v. VegaPenarete,* No. 91-17-01-CR-4, 1991 U.S. Dist. LEXIS 12437, at *26 (E.D.N.C. June 20, 1991) (concluding that defendant's statements were freely and voluntarily made and that "her free will was not overborne because of her emotional state," although she "was visibly upset, at times hysterical, yet at times she was calm[, but a]t all times, she understood what was occurring").

As a result, the Court concludes that the totality of circumstances demonstrate that Adams's waiver of her *Miranda* rights was knowing, intelligent, and voluntary, and that her subsequent statements were voluntarily obtained. Therefore, the Court **RECOMMENDS** that her motion to suppress statements be **DENIED**.

> **C.** *Motion and Amended Motion to Suppress Evidence Recovered from Cell Phone*, **[Docs. 108, 115].**

In her initial motion, Adams first argues that the warrantless search of her cell phone while at her residence was unlawful, primarily reiterating that her purported consent was unlawfully obtained and not voluntary. [Doc. 108 at 2]. In

43

her amended motion, she adds that the search warrant obtained on October 29, 2019 violated the Eleventh Circuit's proscription on untimely warrants, as established by *United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) (holding that a 21-day delay in obtaining a search warrant for a lawfully seized computer hard drive invalidated the search.  [Doc. 115 at 3-4].  She also argues that the search warrant was overly broad and vague, [*id.* at 5-6], and she claims that the search of the phone pursuant to the warrant exceeded the permissible scope of the warrant.  [*Id.* at 6-7].  She further contends that the search of the cell phone resulting from Spitzer's obtaining her passcode violated her Fifth Amendment rights.  [*Id.* at 7-11].

In its post-evidentiary hearing brief, the government stated that it would not seek to introduce in its case-in-chief the fruits of the warranted search of the cell phone but, at trial, would elicit from Spitzer his observations as to what he saw on the phone on the date of Adams's arrest and Adams's statements about what evidence of drug trafficking were on her phone, and, at sentencing, would introduce evidence that would establish the appropriate sentence, arguing that as long as the evidence was not seized to enhance a sentence, illegally seized evidence is admissible at sentencing.  [Doc. 140 at 2 & n. 1 (citing *United States v. Lynch*, 934 F.2d 1226 (11th Cir. 1991))].

In reply, Adams claims that the government's attempt to elicit testimony

from Spitzer about what he observed on the phone is an unlawful end-run around its unconstitutionally-delayed search.  [Doc. 142 at 8-9.]  She also points out that Spitzer did not think about getting a search warrant for the cell phone until much later because he did not believe that the device contained evidence of the charged conspiracy or relevant drug trafficking.  [*Id.* at 9 (citing T98, 99)].  Therefore, she argues, any evidence that he now seeks to testify about is irrelevant and is unsubstantiated by actual admissible evidence because the government is seeking to introduce merely a summary of the evidence that it cannot introduce.  [*Id.*].  Finally, Adams argues that the government has not provided proper notice under Federal Rule of Evidence 404(b), so it may not attempt to introduce evidence of another unrelated drug transaction.  [*Id.* at 9-10].

Because the government as stated that it will not attempt to introduce the results of the forensic search of the phone performed by executing the warrant, the Court has no reason to consider whether or not the delay in applying for and executing the search warrant in this case was reasonable.  *Mitchell*, 565 F.3d at 1351 (directing courts to evaluate the reasonableness of the delay on a case-by-case basis, in light of all the facts and circumstances, after a careful balancing of governmental and private interests). As a result, the undersigned **RECOMMENDS** that Adams's motions to suppress the forensic search of her cell

45

phone, [Docs. 108, 115], be **GRANTED AS MOOT**.

As to the balance of Adams's contentions about her cell phone, the government has the better argument. Even though the government apparently concedes that it did not act swiftly enough, or establish a valid reason for the delay in obtaining the search warrant for the cell phone, and thus likely would be prohibited under *Mitchell* from introducing in its case-on-chief the fruits of the warranted search of the cell phone, Spitzer's review of the phone's contents while at Adams's residence is saved from suppression by Adams' voluntary consent.

After Adams voluntarily consented to the search of her residence and voluntarily answered Spitzer's questions, she was specifically asked to consent to a search of her cell phone. T69, 95-96. She initially was hesitant after Spitzer asked if he could search her phone, as demonstrated by her asking whether he needed a search warrant. After Spitzer responded, "not necessarily," and stated that she either could consent or he could apply for a search warrant, Adams then gave him permission to search the cell phone, provided him with the passcode, and directed him to the correct power cord to use to charge the phone. T69, 95-96. Adams's consent was the product of an essentially free and unconstrained choice. *United States v. Benjamin*, 958 F.3d 1124, 1134 (11th Cir. 2020) (quotation marks removed) (citing *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) and

Schneckloth, 412 U.S. at 225), *cert. denied,* 141 S. Ct. 561 (2020).  Adams was given a choice of either consenting or requiring Spitzer to get a search warrant, which he likely could have since Adams already had stated, in the course of cooperating with him, that there "probably" was evidence of drug deals on the phone.  T69, 96.  Spitzer did not coerce or force Adams to consent to a search of the cell phone, as consenting was consistent with her oft-repeated desire to cooperate in the investigation.  Therefore, although the forensic search of the cell phone was unlawful, what Spitzer viewed on the phone following Adams's voluntary consent to search the phone is not subject to suppression as violative of the Fourth Amendment.  *Nix v. Williams*, 467 U.S. 431, 443 (1984) (holding that "[t]he independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation"); *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012).

As a result, the Fourth Amendment is not violated by Spitzer testifying at Adams's trial about what he observed when he searched Adams's cell phone while questioning Adams in her dining room.  Such testimony does not amount to summary testimony, since Spitzer legitimately may testify as to what he observed, subject of course to the government's laying of a proper foundation that Spitzer's testimony is based upon his observations on the day of the warrantless search and

not as a result of reviewing the results of the search by warrant, and by a sifting cross-examination.   Nor is the Court prepared to recommend at this time that Spitzer's testimony on what he observed when he looked at the cell phone on January 10, 2019 is barred by Rule 404(b), because the Court has not been informed of the specifics of the proposed testimony or whether what he testified about at the suppression hearing as being observed on the cell phone was exhaustive of his observations.   Furthermore, the Court has not been presented an argument that any Rule 404(b) notice is either insufficient or untimely.   *See* Fed. R. Evid. 404(b)(3)(A)-(C).

Accordingly, the undersigned **RECOMMENDS** that Adams's motions to suppress evidence from her cell phone be **GRANTED IN PART AS MOOT AND DENIED IN PART**.  [Docs. 108, 115].

### D. *Motion for Return of Property (Cell Phone)*, [Doc. 109].

In this motion, Adams seeks return of her cell phone that was seized on January 10, 2019.   She alleges that its search was unlawful and that it likely contains exculpatory evidence that she needs for trial.   [Doc. 109 at 1-2].   In response, the government contends that the cell phone contained evidence of drug trafficking and thus is evidence of the drug trafficking conspiracy with which she is charged.  [Doc. 112 at 1-2].  It adds that the Federal Rules of Criminal Procedure

contemplate that the government maintain evidence of a crime and only require that government make such evidence available for inspection and copying by the defendant. [*Id.* at 4 (citing Fed. R. Crim. P. 16(a)(1)(E))]. It also asserts that Adams's co-defendants do not have standing to challenge the search of the phone and that portions of the phone's contents are admissible against them. [*Id.* at 4 n.4]. It also contends that since the cell phone was used to facilitate Adams's drug trafficking, it is subject to criminal forfeiture upon conviction. [*Id.* at 4-5]. The government also states that it provided a forensic image of the phone's contents to Adams in discovery and thus she has access to any exculpatory evidence. [*Id.* at 5]. In reply, Adams states that since the government made a copy of the phone's contents, there is no reason for the government to maintain the phone. [Doc. 142 at 10]. She also reiterates that Spitzer testified at the suppression hearing that the phone did not contain evidence relevant to the charged conspiracy. [*Id.* (citing T98, 99)].

Rule 41(g) of the Federal Rules of Criminal Procedure provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return" by filing a motion "in the district where the property was seized." Fed. R. Crim. P. 41(g). " 'If a motion for return of property is made while a criminal prosecution is pending, the burden

49

is on the movant to show that [s]he . . . is entitled to the property.'' *United States v. Marabini*, No. 06-80021-CR, 2006 WL 3921906, at *6 (S.D. Fla. Dec. 28, 2006) (quoting *United States v. Chambers*, 192 F.3d 374, 377 (3d Cir. 1999)); *see also United States v. Oduu*, 564 Fed. Appx. 127, 130 (5th Cir. Apr. 21, 2014) (per curiam) (footnote omitted).  However, "a Rule 41(g) motion is properly denied if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture, or the government's need for the property as evidence continues." *United States v. Garcon*, 406 Fed. Appx. 366, 369 (11th Cir. Dec. 21, 2010) (per curiam) (citation and internal marks omitted); *see also United States v. McCray*, No. 1:15-CR-212-WSD/AJB, 2017 WL 9472888, at *14 n.17 (N.D. Ga. June 15, 2017) (citations omitted), *report and recommendation adopted,* No. 1:15-CR-212-WSD, 2017 WL 3141172 (N.D. Ga. July 25, 2017).

The government again has the better argument.  Regardless of the unlawfulness of the forensic search of the cell phone, the Court has found that Spitzer's warrantless search of the phone was not unlawful.

Spitzer observed at least one communication on the cell phone concerning a potential methamphetamine transaction between Adams and a third person.  T70, 96.  That likely makes the cell phone subject to criminal forfeiture upon Adams's

conviction.   Moreover, the production of a forensic image of the cell phone to Adams during the course of discovery allows her to search the copy for exculpatory information.

Therefore, the undersigned **RECOMMENDS** that Adams's motion for return of property, [Doc. 109], be **DENIED**.

### E.     *Motion to Bifurcate Count Twelve and 21 U.S.C. Section 851 Enhancement from Remaining Counts*, [Doc. 107].

#### 1.     Arguments

Adams moves to bifurcate the felon-in-possession of a firearm count (Count Twelve) and the sentence enhancement provisions of Counts One and Eleven from the trial of the other counts.  [Doc. 107].  She contends that the felon-in-possession count, which is based on the search of the safe and the seizure of firearms on January 10, 2019, was improperly joined under Federal Rule of Criminal Procedure 8(a) with the drug charges in Counts One and Eleven, which allege, respectively, conspiracy to possess with intent to distribute methamphetamine between October 12, 2017 and March 14, 2018, and possession with intent to distribute methamphetamine on March 14, 2018.  [*Id.* at 2-4].  She also argues that even if properly joined, the gun count should be severed under Federal Rule of Criminal Procedure 14(a) due to prejudicial joinder.  [*Id.* at 4-5].

51

She also alleges that Rule 14 mandates bifurcation of the prior-conviction enhancement allegations.  [*Id.* at 5-6].

The government responds that joinder of the weapon and drug charges was proper because the offenses are based on the same transaction because if Adams had not engaged in the earlier drug trafficking charges, the government would not have known about her weapon possession when she was arrested on those charges. [Doc. 117 at 7-8 (citing *United States v. Ware*, No. 1:17-cr-0447-TCB-JSA, 2019 WL 3387015, at *1 (N.D. Ga. May 13, 2019), *report and recommendation adopted,* No. 1:17-CR-447-TCB-2, 2019 WL 2353457 (N.D. Ga. June 3, 2019))]. It also contends that Adams has not articulated how the prior-felony enhancement was improperly joined, nor satisfied her burden to show undue prejudice, particularly as to the prior felony convictions which likely constitute Rule 404(b) evidence.  [*Id.* at 8-11].

Adams replies that the gun and drug charges are not related, with the gun charge arising from conduct nearly 10 months after the drug conspiracy ended, there is no evidence that Adams possessed or used a firearm during the earlier drug transactions, and the evidence to prove each charge does not overlap.  [Doc. 120 at 1-2].  She additionally argues that the *Ware* case supports her arguments, because in that case there was proper joinder since the magazine from one firearm was

similar to the firearm connected to the charged robberies, but the government in that case conceded that if the evidence was either not intertwined with the charged offenses or admissible as Rule 404(b) evidence, it consented to bifurcation. [*Id.* at 5-6 (citing *Ware*, 2019 WL 3387015, at *3)].

As for the prior-conviction enhancement, Adams argues that the government has not filed a Rule 404(b) notice as to the prior conviction, and in any event, the prior conviction would be unduly prejudicial under Federal Rule of Evidence 403. [*Id.* at 7-10].

### 2.   Discussion

Adams has the better argument on this motion. First, the felon-in-possession charge is not properly joined with the Count One and Eleven drug charges. Joinder is governed by Federal Rule of Criminal Procedure 8(a). Rule 8(a) provides, in relevant part:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged - - whether felonies or misdemeanors or both - - are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Rule 8(a) is construed broadly in favor of initial joinder, allowing joinder of offenses that "are of the same or similar character," even if such offenses do not arise at the same time or out of the same series of acts or transactions. *United States*

*v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993). Indeed, Rule 8(a) is not limited to crimes of the "same" character but also covers those of "similar" character, which means "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." *Id.* (quoting *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980)). Moreover, when offenses are joined under Rule 8(a) by virtue of their "same or similar character," the offenses need only be similar in category, not in evidence. *United States v. Hersh*, 297 F.3d 1233, 1241 (11th Cir. 2002) (citing *United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994)). This similarity can be apparent from the face of the indictment or by the government's representations before trial, if such representations are borne out in the evidence presented during trial. *Hersh*, 297 F.3d at 1241 n.10;

In *United States v. Dominguez*, 226 F.3d 1235, 1238-42 (11th Cir. 2000), the Eleventh Circuit set forth the procedure to be used in determining whether initial joinder is proper under Rule 8. Generally speaking, the Court must first look to the face of the indictment to determine whether joinder is proper under Rule 8. If the indictment contains allegations which demonstrate that the offenses arise from transactions connected together or are parts of a common scheme, the Court may rely upon the indictment to determine that initial joinder is proper. If, however, the face of the indictment does not reflect the propriety of joinder, the Court may

54

consider other evidence proffered by the government. Thus, in *Dominguez*, where the government joined mortgage fraud offenses with narcotics offenses, and the relationship between those offenses did not appear on the face of the indictment, joinder was ruled proper since the government's evidence demonstrated that the drug activity was the motive for the mortgage fraud.

In addition, joinder may be appropriate where diverse acts constitute parts of a common scheme or plan.  Fed. R. Crim. P. 8(a).

Second, the Court considers whether prejudice to the defendant resulting from joinder mandates severance under Federal Rule of Criminal Procedure 14. *Hersh*, 297 F.3d at 1241; *Walser*, 3 F.3d at 385.  That inquiry is conducted pursuant to Rule 14(a), which provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

The defendant has to show that joinder will cause compelling prejudice against which the district court can offer no protection.  *Walser*, 3 F.3d at 385. Demonstrating compelling prejudice is "a heavy burden." *United States v. Hogan*, 986 F.2d 1364, 1375 (11th Cir. 1993).  "The test for assessing compelling prejudice is whether under all the circumstances of a particular case it is within the capacity

of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own . . . conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict." *Hersh*, 297 F.3d at 1243; *Walser*, 3 F.3d at 386-87.  If so, "though the task be difficult," there is no compelling prejudice.  *Id.* (citation omitted).  If the prejudice may be cured by a cautionary instruction, severance is not required.  *Walser*, 3 F.3d at 387; *United States v. Jacoby*, 955 F.2d 1527, 1542 (11th Cir. 1992).

In this case, the face of the indictment does not demonstrate that the felon-in-possession charge is properly joined with the drug charges.  Although temporal differences do not necessarily dictate misjoinder, here there is 10 months between the weapons possession and the drug charges.  The indictment does not allege and the government does not allege in its response that Adams carried or used a firearm in the course of the drug charges alleged in Counts One and Eleven.  Significantly, in the Court's opinion, the firearms located in January 2019 are not alleged by the government to have been used or carried by Adams during and in relation to a drug trafficking crime or possessed in furtherance of such a crime, in violation of 18 U.S.C. § 924(c).  Nor did the government allege in the superseding indictment that Adams possessed or conspired with another person to possess, any of the drugs located in her residence at the time of her arrest.  If such a charge had been brought,

the Court's recommendation might be different.   In short, the January 2019 possession of firearms is not the same or similar character, or based on the same act or transaction, or connected with or constitute part of a common scheme or plan with relation to the October 2017 to March 2018 drug crimes.

The government's explanation in its brief in opposition—that the felon-in-possession is part of the same transaction as the earlier drug crimes because but for Adams's commission of the drug crimes in 2017 and 2018 which led to her indictment and arrest, and her inculpatory statements and the search of the safe at the time of her arrest—is a bridge too far.   While *Dominguez* allows the Court to find proper joinder by the government's showing outside of the four corners of the indictment, the government's proffer is insufficient to establish a nexus between these disparate offenses.

This conclusion is not altered because the government might try to introduce Adams's prior drug conviction under Rule 404(b) to help prove the drug offenses with which Adams is charged in this case.   The firearms possession is simply not relevant to Adams's commission of the charged drug offenses.   The *Ware* case relied upon by the government is inapposite because in that case, the government formulated a plausible connection between the offenses despite the fact that they

occurred at different times.[14]

Since the drug and weapons charges are misjoined, the Court need not spend much time on claimed prejudice.  Frequently, a defendant's claimed prejudice can be addressed by instructing the jury that each count is to be considered separately. *See Walser*, 3 F.3d at 387 ("[I]f the possible prejudice may be cured a cautionary instruction severance is not required."); *see also* Eleventh Circuit Pattern Jury Instructions (Criminal) B10.4 ("You must consider each crime and the evidence relating to it separately.").  However, because the offenses are so disparate and the government has not demonstrated how they are connected, and therefore this instruction would not mitigate the prejudice.

---

[14]     In *Ware*, Judge Anand concluded:

>        The record before the Court clearly shows that Counts 6 and 18 are properly joined with the robbery and brandishment counts.  The allegedly illegal possession of ammunition that gives rise to Count 6 is clearly intertwined with, and is part of the same actions that give rise to, Counts 1, 4 and 5.  The act of possession that gives rise to Count 18 did not occur during an actual charged robbery or during the conspiracy.  But it occurred during the Defendant's arrest on these charges, and according to the Government, involved a magazine that resembles the magazine used in some of the charged robberies. Thus, the act of illegal possession related to possession of the same or similar ammunition as was used in the robbery conspiracy within just weeks of the robberies. The offenses are sufficiently linked to justify joinder.

*Ware*, 2019 WL 3387015, at *2.

Adams also is correct that the prior-felony enhancements alleged in Counts One and Eleven should be bifurcated from the trial on guilt or innocence, but not for the reasons she advanced.

Title 21 U.S.C. § 841 prohibits the knowing or intentional manufacture, distribution, or dispensation of a controlled substance and possession with intent to manufacture, distribute, or dispense a controlled substance. 21 U.S.C. § 841(a)(1). Section 841 provides for a sentencing enhancement in the case of a violation involving, as relevant here, at least 50 grams of methamphetamine, "[i]f any person commits such a violation after a prior conviction for a serious drug felony." *Id.* § 841(b)(1)(A)(viii). If the requirements for the enhancement are met, "such person shall be sentenced to a term of imprisonment of not less than 15 years and not more than life imprisonment." *Id.* To obtain a sentence enhancement under § 841, the government must comply with the notice requirement of 21 U.S.C. § 851(a)(1), which provides that an enhancement based on prior convictions may not be imposed "unless before trial, . . . the United States attorney files an information with the court (and serves a copy of such information on the [defendant] or counsel for the [defendant]) stating in writing the previous convictions to be relied upon." *United States v. Lee*, 268 Fed. Appx. 813, 816 (11th Cir. Mar. 5, 2008) (citing *United States v. Rutherford*, 175 F.3d 899, 903

59

(11th Cir. 1999) (quoting 21 U.S.C. § 851(a)(1))).

The issue as to whether upon conviction Adams is eligible to be sentenced under the § 851 enhancement is not a matter for the jury, but an issue for the District Judge if Adams is convicted of one or more of the drug charges.  This is because Adams's prior conviction subjecting her to an enhanced sentence under § 851 upon conviction of either Count One or Count Eleven is not an element of the crime and thus does not get to be decided by the jury.  *Almendarez-Torres v. United States*, 523 U.S. 224 (1998) (upholding Congress's decision to treat prior convictions as a sentencing factor rather than an element of a federal criminal offense); *United States v. Thomas*, 242 F.3d 1028, 1035 (11th Cir. 2001); *see also United States v. Alleyne*, 570 U.S. 99, 111 n.1 (2013); *United States v. Dames*, 556 Fed. Appx. 793, 796 (11th Cir. Feb. 18, 2014).

Thus, the undersigned **RECOMMENDS** that Defendant's motion to bifurcate, [Doc. 107], be **GRANTED IN PART AND DENIED AS MOOT IN PART**.  Specifically, the undersigned **RECOMMENDS** that the motion be **GRANTED** as to bifurcation of her trial on Count Twelve from the trial on Counts One and Eleven, but **DENIED AS MOOT** as to the portion seeking bifurcation of the prior-conviction enhancements alleged in Counts One and Eleven, since the sentence enhancement provisions of those counts are for the sentencing court to

60

decide if Adams is convicted on one or both of those counts.

### III.   *CONCLUSION*

For all of the reasons stated above, the undersigned **RECOMMENDS** the following as to at Adams's pretrial motions: motion to suppress statements, [Doc. 105], be **DENIED**; motion to suppress evidence from 220 Oakwood Circle, Stockbridge, Ga., [Doc. 106], be **DENIED**; motion to bifurcate Count Twelve and the 21 U.S.C. § 841 enhancement, [Doc. 107], be **GRANTED IN PART and DENIED IN PART AS MOOT**; motion to suppress evidence from cell phone, [Doc. 108], and amended motion to suppress evidence from cell phone, [Doc. 115], be **GRANTED IN PART and DENIED IN PART**; and motion for return of property (cell phone), [Doc. 109], be **DENIED**.

The Court has now ruled on all matters referred to it pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014).   Accordingly, this matter as to this Defendant is **CERIFIED READY FOR TRIAL**

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 17th day of March, 2021.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE