UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Case No. 1:18-CR-507 | |
| | ) | |
| LAURA ADAMS, | ) | |
| Defendant. | ) | |

## DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION (DOC. 162)

Ms. Adams files the following objections to the report and recommendation issued on March 17, 2021. Doc. 162.

**I.    Ms. Adams' objects to the magistrate court's findings of fact, conclusions of law, and recommendation to deny her Motion to Suppress Statements (Doc. 105).**

Ms. Adams objects to the magistrate court's finding that her statements were constitutionally obtained.  Doc. 162 at 36.  She asserts that she could not provide a knowing and voluntary waiver under the circumstances.

A person in custody may waive his rights, but to be operative the waiver must be made voluntarily, knowingly, and intelligently. *Id.* A confession is involuntary whether coerced by physical intimidation or psychological pressure. *Townsend v. Sain*, 372 U.S. 293, 307 (1963).  In order to find [the defendant's] confession voluntary, a court must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will

not being overborne by the pressures and circumstances swirling around him. *Jurek v. Estelle,* 623 F.2d 929, 937 (5th Cir. 1980) *(en banc), cert. denied*, 450 U.S. 1001, 1014(1981). If the Government violates a person's right against compelled self-incrimination, then generally the compelled statements must be suppressed. *Missouri v. Seibert,* 542 U.S. 600, 608 (2004).

Officers arrested Ms. Adams in the driveway of her residence approximately 4:10 p.m. on January 10, 2019. Doc. 132 at 5-6, 31, 50.  She remained handcuffed during her interactions with officers. Doc.  132 at 95.  Officer Kelly Bennett testified that he arrested Ms. Adams by handcuffing her behind her back and that she was not free to leave.  Doc. 132 at 9, 81.  The "general energy" was "amped up" and Ms. Adams was "hysterical, shaking, visibly shaking," and "nervous." Doc. 132 at 9-10.  Sergeant Spitzer arrived to meet with Ms. Adams "in case" she wanted to cooperate at approximately one minute later.  Doc. 132 at 48, 50, 87.  He explained that she was "a little bit upset" . . . "borderline sobbing."   Doc. 132 at 51.  Although his stated goal was to "arrest her and take her back," Sergeant Spitzer decided to question Ms. Adams at her residence.  Doc. 132 at 78.  He also brought at least 6 Henry County Officers with him to pick Ms. Adams up after she had been arrested by Officer Bennett.  Doc. 132 at 77-78.  At least nine officers and agents were present at the scene to arrest the 5 foot 2-inch-tall Adams.  Doc. 132 at 41, 81. In contrast, Sergeant Spitzer weighed in at 6'1" and 240 pounds.

Doc. 132 at 49.   Officers Spitzer, Vuong, and Bennett were standing near Ms. Adams when Sergeant Spitzer read her *Miranda* rights and began questioning her. Doc. 132 at 52.   The officers had guns, but they were not drawn. Doc. 132 at 33, 51.   No *Miranda* waiver was signed and the hours-long search and interview were not recorded.   Doc. 132 at 12, 82.   According to Sergeant Spitzer, Ms. Adams was still upset and sobbing while being read *Miranda* rights and questioned about her understanding of them.   Doc. 132 at 54.

After grabbing Ms. Adams in her driveway and handcuffing her behind her back, officers claimed that Ms. Adams repeatedly said she wanted to "cooperate" but she wanted to do it in private.   According to Officer Bennett, after Sergeant Spitzer recommended that they meet inside her residence, Ms. Adams agreed. Doc. 132 at 15.   Officer Bennett testified that Ms. Adams then unlocked her front door using her keys.   Doc. 132 at 16.   He could not remember how she got the keys. Doc. 132 at 44.   Sergeant Spitzer stated that Ms. Adams told officers the keys were in her purse, that he retrieved them, and she unlocked the door. Doc. 132 at 56-67.

Officer Bennett and "six or more" other officers then conducted a "protective sweep" of the residence for "less than 2 minutes," during which they discovered a woman in the basement with "an awful lot of crystalline substance on top of her purse."   Doc. 132 at 18, 37.

Based on Sergeant Spitzer's representations that Ms. Adams was sobbing continuously throughout their interactions and her claims that she "would do anything," it is apparent that her will was overborne by the officers and their show of force in her front yard when she agreed to speak with them.  She was standing in her driveway for everyone in the neighborhood to see when she was grabbed by Officer Bennett and handcuffed behind her back.  Almost immediately, at least 9 officers appeared with firearms asking to question her inside her home.  She acquiesced.  Although Sergeant Spitzer claimed that all nine officers were necessary to effectuate the arrest (even though Ms. Adams was already in custody), it is clear that the show of force was meant to influence Ms. Adams' decision to speak with officers and to allow them into her home.  The officer's repeated claims that he would notify the AUSA about Ms. Adams and her lack of cooperation only heightened her sense of panic and, under the circumstances, it is not surprising that she gave in.  Because Ms. Adams could not be said to have voluntarily consented under the circumstances, her statements at or near the time of her arrest should be suppressed.

## II. Ms. Adams' objects to the magistrate court's findings of fact, conclusions of law, and recommendation to deny her Motion to Suppress Evidence Seized from 220 Oakwood Circle, Stockbridge, GA (Doc. 106).

Ms. Adams has moved to suppress evidence seized from her home including evidence contained in a safe in the home as well as other drugs and drug

4

paraphernalia allegedly located throughout the house. She objects to the magistrate court's finding that she freely and voluntarily consented to the search of her residence. Doc. 162 at 16. She objects to the magistrate court's finding that she was not coerced into giving consent due to a threat by officers to obtain a warrant. Doc. 162 at 24.

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir. 1989). The government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'" *United States v. Hidalgo,* 7 F.3d 1566, 1571 (11th Cir. 1993). Consent may "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). Among the relevant circumstances that may be considered are the person's youth, lack of education or low intelligence; the lack of any warnings regarding the person's constitutional rights, and evidence of duress or coercion, such as deprivation of food or sleep and prolonged detention or questioning. *Id.* at 226.

The magistrate court cites several cases, including *United States v. Boukater*, 409 F.2d 537 (5th Cir. 1969), to support its finding that Ms. Adams was not coerced into consenting to the search even though when asked for consent to

search, Ms. Adams questioned whether she had to agree to the search or not. Doc.

132 at 21-22.  In *Boukater*, however, the court noted:

> The statement by Rivers about procuring a search warrant is more
> troublesome and might lead us to a different result if the evidence
> indicated that Boukater was in custody and that the agent either said
> or implied that he might as well consent because a warrant could be
> quickly obtained if he refused. However, Rivers was very emphatic in
> testifying that he did not pressure appellant by saying that he would
> get a warrant and make a search even if appellant withheld consent; he
> merely said he would *attempt* to get a search warrant. Since appellant
> had been advised that he was not under arrest and was free to leave,
> he would not have been coerced into consenting to an immediate
> search by the agent's statement that he would attempt to get a warrant.
> As we say, this factor is troublesome, but we have concluded that it
> does not taint the search since everything else points toward
> completely voluntary consent.

*Id.* at 538.  Ms. Adams's case is the more troubling scenario outlined in *Boukater*.

She was handcuffed and she was not free to leave when officers implied that she

might as well consent because a warrant could be quickly obtained if she refused.

See Doc. 132 at 9, 81.  According to Officer Bennett, Officer Spitzer told Ms.

Adams he would contact the U.S. Attorney's Office and apply for a search warrant

if she did not consent to the search.  Doc. 132 at 23.  According to Sergeant

Spitzer:

> I said I would call the AUSA assigned to the case. I would tell her
> about all the facts I know about the case including what I am seeing in
> plain view, what was found downstairs in plain view and ask about
> applying for a search warrant.

Doc. 132 at 90, 92.   He also admitted that he recorded in his report that he told Ms. Adams he would call the AUSA and "tell her that you're not cooperating." Doc. 132 at 90.  According to Officer Bennett, Ms. Adams then agreed to sign the consent form.  Doc. 132 at 23.  Ms. Adams was still handcuffed when the consent to search was presented.  Doc. 132 at 21.  She was still sobbing.  Doc. 132 at 61.

During the search of the residence, officers allegedly located a safe in Ms. Adams' room.  Doc. 132 at 64, 94. A key to the safe was on Ms. Adams' key ring and officers used it to open the safe.  Doc. 132 at 65. Inside, officers located three guns, needles, a digital scale, baggies containing suspected methamphetamine, and a container with what officers believed to be meth residue inside. Doc. 132 at 66.

Ms. Adams asserts that she could not – and did not – freely and voluntarily provide consent while handcuffed, crying, and being threatened by officers.  She is a drug addict with a prior criminal history that was faced with 9 police officers in her front yard.  She was grabbed and handcuffed and she repeatedly said she wanted to cooperate with the officers.  However, when officers determined that they did not believe the things she said, they threatened to call the prosecuting attorney and tell her that Ms. Adams was not cooperating.  Officers had already located a drugs in connection with another person in her house and Ms. Adams was at points hysterical and other points sobbing.  It was under these circumstances that she was asked for consent to search her house.  Because she could not give

voluntary consent under the circumstances, the evidence recovered from the house should be suppressed.

**III.  Ms. Adams' objects to the magistrate court's findings of fact, conclusions of law, and recommendation to deny her Motion to Suppress Evidence Seized from Cell Phone (Docs. 108 and 115).**

Ms. Adams objects to the magistrate court's finding that Sergeant Spitzer's review of the phone is saved from suppression by Adam's consent.  Doc. 162 at 46.  The government admits that it did not move in a timely manner to do a full forensic search of the phone and for that reason, it has agreed that it cannot use the contents of that search at trial.  Instead, it wants to have Sergeant Spitzer testify about what he allegedly saw when he scanned the phone in Ms. Adams' presence. The magistrate court finds such testimony should be permitted.  Doc. 162 at 47.

Ms. Adams objects to this attempt to end-run around the illegal search of the phone.  No evidence of this discussion should be permitted at trial.  As Sergeant Spitzer testified, he decided not to get a search warrant for the phone because it did not contain evidence related to the charged conspiracy or the drug distribution charge.  Doc. 132 at 98, 99.  As such, any claim that he observed evidence of unrelated drug activity on the phone at the time of Ms. Adams' arrest is irrelevant. It is also unsubstantiated by actual admissible evidence.  The government is attempting to provide a summary of the alleged content of the phone, while admitting that the content of the phone should not be admitted at trial.  Ms. Adams

asks this Court to deny this request.  Finally, the government has provided no 404(b) notice regarding this alleged discussion of other un-related drug transactions and it does not appear that there is a proper basis to admit such evidence, even if it did.

## IV. Ms. Adams' objects to the magistrate court's findings of fact, conclusions of law, and recommendation to deny her Motion for Return of Cell Phone (Doc. 109).

Ms. Adams objects to the magistrate court's finding that Ms. Adams' phone should be retained by the government.  The government has made a copy of the contents of Ms. Adams' cell phone.  Sergeant Spitzer has also testified that the evidence contained therein is not relevant to the current charged conspiracy.  Doc. 132 at 98, 99.  Therefore, there is no basis for the phone to be subject to forfeiture in this case.  There is also no evidentiary need for the government to maintain the phone.  Ms. Adams again asks that the phone be returned to her through present counsel.

Respectfully submitted this 1st day of April 2021.

Respectfully submitted,

*s/Saraliene S. Durrett*
SARALIENE S. DURRETT
1800 Peachtree Street
Suite 300
Atlanta, GA 30309
(404) 433-0855
ssd@defendingatl.com

## **CERTIFICATE OF SERVICE**

This is to certify that the undersigned has this date electronically filed the foregoing objections to report and recommendation with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney(s) of record:

All Defense Counsel

All AUSAs of record

Respectfully submitted this 1st day of April 2021.

Respectfully submitted,

*s/Saraliene S. Durrett*
SARALIENE S. DURRETT
1800 Peachtree Street
Suite 300
Atlanta, GA 30309
(404) 433-0855
ssd@defendingatl.com